804 A.2d 596

AVI MACCHI, PLAINTIFF–APPELLANT/CROSS–RESPONDENT, v. CONNECTICUT GENERAL INSURANCE COMPANY A/K/A CGU/NJ, FORMERLY KNOWN AS GENERAL ACCIDENT IN-SURANCE, DEFENDANT–RESPONDENT/CROSS–APPEL-LANT.

Superior Court of New Jersey
Appellate Division

Argued May 6, 2002—Decided August 20, 2002.

Before Judges PETRELLA, KESTIN, and STEINBERG.

*Martin S. Pappaterra* argued the cause for appellant (*Begley, Carlin & Mandio*, attorneys; *Karen Saraco Burns*, on the brief; *Pellettieri, Rabstein and Altman*, of counsel).

*Robert John Aste* argued the cause for respondent (*Morgan, Melhuish, Monaghan, Arvidson, Abrutyn & Lisowski*, attorneys; *Elliot Abrutyn*, of counsel; *Mr. Aste*, on the brief).

The opinion of the court was delivered by

KESTIN, J.A.D.

Plaintiff sustained injuries when she stopped and left the car she was driving to help the driver of another, overturned vehicle. She seeks a declaratory judgment establishing her right to recover under the uninsured (UM) or underinsured (UIM) motorist coverage of an automobile insurance policy issued by defendant to the owner of the car plaintiff was driving, Innovative Packaging Corp. (the Innovative policy)[1].

---

[1] The terms of another policy issued by defendant to plaintiff's estranged husband covering another vehicle (the Macchi policy) were of significance to the trial court, but are of no consequence in the light of our decisional rationale.

The matter came before the trial court on cross-motions for summary judgment argued on October 20, 2000. The motion judge determined as a matter of law that plaintiff had been "occupying" the insured vehicle at the time she was injured and was therefore covered under the Innovative policy. Accordingly, plaintiff's motion for summary judgment was granted and defendant's was denied.

Defendant moved for reconsideration and also raised a new issue regarding the applicability of a "step-down" provision in the Innovative policy. That motion was argued on December 15, 2000. On May 18, 2001, the judge granted the motion for reconsideration and made four rulings articulated in an oral opinion,

- abjuring the October 20 ruling that plaintiff was "occupying" the insured vehicle;

- determining that plaintiff was nevertheless entitled to coverage because defendant was estopped, by reason of its own conduct and delay in refusing coverage, from denying plaintiff's entitlement to recover;

- holding defendant correct in asserting that plaintiff's recovery should be limited to $100,000 under the "step-down" provision of the Innovative policy; and

- denying defendant's request to stay the customary UM/UIM arbitration.

Each party appeals from portions of the order. Plaintiff argues that the trial court erred in 1) holding that plaintiff was "stepped-down" to the $100,000 UM/UIM policy limits available under the Macchi policy, thereby denying plaintiff's claims for UM/UIM benefits under the $1,000,000 policy limits available in the Innovative policy; and 2) repudiating its October 20, 2000 ruling that plaintiff was "occupying" the covered automobile within the terms of the Innovative policy for the purpose of her UM/UIM claims against defendant. In addition to meeting plaintiff's arguments, defendant contends it gave plaintiff timely notice that she did not qualify for UM/UIM coverage under the Innovative policy and, therefore, defendant should not be estopped from denying coverage.

---

Thus, we need not evaluate the adequacy of the fact-finding the motion judge made in connection with that policy's applicability.

No dispute of fact exists regarding the incident that gave rise to the claim. We adopt the motion judge's summary in the October 20, 2000 disposition:

> In this action, plaintiff seeks to recover underinsured motorist benefits from the defendant[ ] arising out of a motor vehicle accident which occurred on February 4th, 1998, on Route 130. The facts surrounding the event are not in dispute. But, for purposes of this motion, the Court notes, briefly, the plaintiff was operating, with permission, a vehicle owned by her estranged husband's business. On the date in question, plaintiff, along with her son, was en route to a video store, to return a video, when she witnessed a one-car accident on the opposite side of the road, which resulted in an overturned vehicle, in which the driver, Morlack, appeared trapped.

> Plaintiff stopped her vehicle in the vicinity of the accident, and went to assist the driver. The driver was able to get out of the vehicle. While standing alongside the roadway, near the disabled vehicle, and its occupant, the plaintiff was struck when the vehicle operated by defendant Barbuto collided with the disabled vehicle, which, apparently, was partially in the roadway, causing the disabled vehicle to spin around, and strike the plaintiff.

According to plaintiff, when she stepped out of her own car to assist Morlack, she told her son to call the police and said that she "would be right back." She left her engine running, the lights on, and her purse in the car.

Plaintiff sustained serious injuries, including a collapsed lung, pelvic fracture, concussion, and temporal lobe hemorrhage. She suffered a severe brain injury resulting in multiple residual deficits including amnesia, impaired memory, and poor problem solving. According to plaintiff's doctors, she is permanently disabled and will require ongoing medical, orthopedic and neuropsychological/cognitive therapies and treatment for the remainder of her life. Her medical bills as of September 2000 totaled $45,000.

At the time of the accident, plaintiff and her husband, Michael, were separated and living in different homes in Florence, New Jersey. Although plaintiff claimed she had been attempting a reconciliation at the time, Mr. and Mrs. Macchi never lived together again, and they divorced in June 1999. The vehicle plaintiff was driving at the time she incurred her injuries was a Chevrolet Corvette owned by Michael or his business. That car

was considered to be plaintiff's car. She used it on a daily basis, including for commuting to her job in Pennsylvania.

Michael Macchi owned the business in Trenton, Innovative Packaging Corporation ("Innovative"), which was the named insured on the Innovative policy, a "business auto policy." The Corvette was one of four covered vehicles. The policy specifies $1 million in both UM and UIM coverage on the Corvette. The UM and UIM coverage endorsement reads as follows:

A. COVERAGE

1. We will pay all sums the "insured" is legally entitled to recover as compensatory damages from the owner or driver of an "uninsured motor vehicle" or an "underinsured motor vehicle". The damages must result from "bodily injury" sustained by the "insured," or "property damage" caused by an "accident". The owner's or driver's liability for these damages must result from the ownership, maintenance or use of an "uninsured motor vehicle" or an "underinsured motor vehicle".

The UM/UIM endorsement defines "insured" to include four categories:

B. WHO IS AN INSURED

1. You.

2. If you are an individual, any "family member".

3. Anyone else "occupying" a covered "auto" or a temporary substitute for a covered "auto". The covered "auto" must be out of service because of its breakdown, repair, servicing, loss or destruction.

4. Anyone for damages he or she is entitled to recover because of "bodily injury" sustained by another "insured".

The policy defines "occupying" as meaning "in, upon, getting in, on, out or off." And "family member" is defined as "a person related to you by blood, marriage, or adoption who is a resident of your household, including a ward or foster child."

In the separate "Personal Auto Policy," the Macchi policy, defendant insured another vehicle owned personally by Michael Macchi, a 1998 Lincoln. Michael is the only named insured on that policy. The policy also insures any "family member" of a named insured, which is defined to mean "a person related to you by blood, marriage or adoption who is a resident of your household." That policy limits UM/UIM coverage to $100,000.

Plaintiff sued Barbuto and Morlack in the United States District Court for the District of New Jersey, seeking damages for her injuries. Morlack was uninsured, and Barbuto had liability insurance of $100,000. With defendant's authorization or acquiescence, plaintiff settled her claim against Barbuto for $80,000, payable by Barbuto's insurer.

Having previously notified defendant of her intention to pursue both UM and UIM claims, plaintiff, in September 1999, demanded arbitration of her claims, as required by the Innovative policy. When defendant resisted arbitration, plaintiff, in October 1999, filed a complaint in the Law Division seeking to compel defendant to appoint an arbitrator. In February 2000, the parties executed a Consent Order by which defendant agreed to begin arbitration.

In May 2000, plaintiff was deposed by defense counsel in preparation for the arbitration hearings. After reading the transcript of that testimony, defense counsel, in July 2000, notified plaintiff's counsel that defendant was declining coverage, citing the policy's definition of "occupying." According to that letter, because plaintiff was not "occupying" the Corvette at the time of the accident, she could not qualify as an "insured person." Thus defendant refused to proceed with the arbitration, and plaintiff filed the instant complaint.

Initially, the motion judge, influenced by the reasoning of a trial court opinion in *Newcomb Hospital v. Fountain,* 141 *N.J.Super.* 291, 357 *A.*2d 836 (Law Div.1976), in a related subject matter area, ruled in favor of plaintiff on this issue. The motion judge applied a guiding principle of construction, that an insurance policy should be interpreted to effect the objectively reasonable expectations of the insured, and concluded:

> [I]t is clear that plaintiff had not abandoned her purpose, namely, to go to the video store. At most, plaintiff was detoured from her itinerary in response to an accident for good Samaritan purposes. The insured, having elected the underinsured motorist option, surely is permitted, reasonably to expect that exiting the vehicle for emergency purposes, still, nonetheless, enveloped the occupant, for purposes of the definition of occupying, under the insurance policy. Her destination had not been completed. She was not approaching the car with the intent to enter it, initially. No, she was exiting out of the car. Nonetheless, she had not

> abandoned her purposes. Instead, she had left the motor vehicle with the intent to return to it, after rendering roadside assistance.
>
> Clearly, this court does not find that plaintiff had abandoned the purposes, and that she falls under the definition of occupying the motor vehicle, for purposes of the insurance policy in question.

In reconsidering the question, the motion judge reached the opposite conclusion on the "occupying" question. She explained that she had focused unduly on plaintiff's intentions to return to the Corvette to continue on to her destination. Rather, the judge opined, she should have asked whether the accident was "caused by some specific activity associated with the plaintiff's car," as had occurred in *Newcomb*. On reconsideration, she concluded that it was not. The judge ruled that "[plaintiff's] activity, albeit as a good Samaritan, was not substantially associated with her occupancy of the motor vehicle to bring her subsequent accident within the ambit of the policy's coverage."

In reaching that conclusion, the judge relied in large part on our unpublished opinion in another matter that was the basis of defendant's motion for reconsideration. Embracing that opinion's emphasis on the language of the policy at issue, the motion judge quoted the Innovative policy's definition of "occupying" and reasoned: "Under no interpretation of this language can the court conclude that the conduct of the plaintiff constituted in, upon, getting in, on, out, or off of the covered vehicle."

Plaintiff contends on appeal that the trial court erred in its ultimate ruling that she was not "occupying" the Corvette and, consequently, failed to meet the definition of an "insured" under the Innovative policy. Defendant responds that, because plaintiff had stepped out of the car and became a pedestrian, she fell outside the plain terms of the policy's definition of "occupying", in that she was not "in, upon, getting in, on, out or off" a covered vehicle at the instant her injuries occurred.

█ Applying the underlying rationales of *Torres v. Travelers Indem. Co.*, 171 *N.J.* 147, 793 *A.*2d 592 (2002), and *Mondelli v. State Farm Mut. Auto. Ins. Co.*, 102 *N.J.* 167, 506 *A.*2d 728 (1986); *see also De Almeida v. General Accident Ins. Co.*, 314 *N.J.Super.*

312, 714 *A*.2d 967 (App.Div.), *certif. denied,* 157 *N.J.* 541, 724 *A*.2d 801 (1998), we conclude the motion judge erred on the "occupying" issue in her ruling on reconsideration. The facts in *Torres* are, for all intents and purposes, indistinguishable from those before us in this matter. In both cases, the claimant drove the covered vehicle to the place where the accident occurred and, leaving the engine running, stepped from the vehicle to perform an essential task with every intention of returning to the vehicle to continue the journey. The one factual difference that the claimant in *Torres* was discharging his employment duties in driving the covered vehicle and that plaintiff herein was on a personal errand is of no consequence in applying the pertinent language of the insurance policy.

This disposition renders defendant's appeal moot. Having determined that plaintiff is covered by the Innovative policy insuring the vehicle she was driving, we need not address the motion judge's view that defendant is estopped from denying coverage. Because the motion judge reached the correct result on the coverage issue, albeit for a reason we do not address, the judgment declaring coverage is affirmed.

The remaining issue is whether the trial court was correct in determining that plaintiff is governed by the "step-down" provisions of the Innovative policy. In this regard, the motion judge opined:

The Court finds that the step-down policy provision applies to the plaintiff in this matter because the plaintiff is an insured who is not the individual named insured under the CGU Innovative policy....

Plaintiff is also an insured who is not the individual named insured under the CGU Macchi policy.... Three, plaintiff is an insured as ... a family member under the CGU Macchi policy. And four, the CGU Macchi policy provides similar UM/UIM coverage to the UM/UIM coverage provided under the CGU Innovative policy. Five, the CGU Macchi policy has a $100,000 limit for the similar UM/UIM coverage. Six, the CGU Macchi policy of $100,000 limit is less than the $1,000,000 limit set forth for uninsured motorists/under-insured motorists benefits in the CGU Innovative policy.

Therefore, the Court is satisfied that the most the defendant CGU would be required to pay for all damages resulting from plaintiff's accident with the uninsured motor vehicle ... would not exceed the highest applicable limit under

the CGU Macchi policy that insures plaintiff as a family member. And that is ... the most ..., therefore, that the defendants would be required to pay if plaintiff proves her uninsured motorist claim is $100,000.

The Court is satisfied that the step-down provision's language is enforceable pursuant to *Aubrey v. Harleysville Insurance Company*, 140 *N.J.* 397, 658 *A.*2d 1246 (1995); ... *Rao v. Universal Underwriters Insurance Company*, [228 *N.J.Super.* 396, 549 *A.*2d 1259 (App.Div.1988) ]; and *General Accident Group Insurance v. Liberty Mutual*, [191 *N.J.Super.* 530, 468 *A.*2d 430 (App.Div.1983) ].

We disagree with an essential premise of the motion judge's rationale that "plaintiff is an insured who is not the individual named insured under the CGU Innovative policy." Therefore, we reverse the determination that plaintiff is subject to the "step-down" provision of the Innovative policy.

The Innovative policy provides "business auto coverage" for four motor vehicles including the 1997 Chevrolet Corvette assigned by the owner to plaintiff for her use. The business auto policy had been purchased by Innovative Packaging Corp. of Trenton, a business in which plaintiff's husband was the principal owner. The policy declarations describe the garage location of three of the covered vehicles, apparently used directly in the day to day business affairs of Innovative, as being in "Ewing, N" presumably denoting Ewing, New Jersey. The fourth vehicle, plaintiff's Corvette, is described as having a garage location of "Ardley, P", which appears to be a misprint [2] but which, in any event, seems to have no relationship to any business locus of Innovative. The declarations also recite specifically that both the UM and UIM policy limits for the Corvette are $1,000,000.

As we have noted, the stated "insured" under the UM/UIM policy endorsement is as follows:

B. Who Is An Insured

1. You.

2. If you are an individual, any "family member".

---

[2] We note that the address alleged for plaintiff in the complaint is in Yardley, Pennsylvania.

3. Anyone else "occupying" a covered "auto" or a temporary substitute for a covered "auto". The covered "auto" must be out of service because of its breakdown, repair, servicing, loss or destruction.

4. Anyone for damages he or she is entitled to recover because of "bodily injury" sustained by another "insured".

After specifying "Exclusions", the endorsements continue with the "step-down" provision at issue here:

D. Limit of Insurance

1. Regardless of the number of covered "autos", "insureds", premiums paid, claims made or vehicles involved in the "accident", the Limit Of Insurance shown in the Schedule or Declarations for Uninsured Motorists Coverage and Underinsured Motorists Coverage is the most we will pay for all damages resulting from any one "accident" with an "uninsured motor vehicle" or an "underinsured motor vehicle".

a. However, subject to our maximum Limit of Insurance for this coverage, if:

(1) An "insured" is not the individual named insured under this policy;

(2) That "insured" is an individual named insured under one or more other policies providing similar coverage; and

(3) All such other policies have a limit of insurance for similar coverage which is less than the Limit Of Insurance for this coverage;

then the most we will pay for all damages resulting from any one "accident" with an "uninsured Motor vehicle" or an "underinsured motor vehicle" shall not exceed the highest applicable limit of insurance under any coverage form or policy providing coverage to that "insured" as an individual named insured.

b. However, subject to our maximum Limit of Insurance for this coverage, if:

(1) An "insured" is not the individual named insured under this policy or any other policy;

(2) That "insured" is insured as a "family member" under one or more other policies providing similar coverage; and

(3) All such other policies have a limit of insurance for similar coverage which is less than the Limit of Insurance for this coverage;

then the most we will pay for all damages resulting from any one "accident" with an "uninsured motor vehicle" or an "underinsured motor vehicle" shall not exceed the highest applicable limit of insurance under any coverage form or policy providing coverage to that "insured" as a "family member".

 Our interpretation of the terms of the Innovative policy begins with the understanding that plaintiff is for all intents and purposes an individual named insured under that policy. If it were otherwise, *i.e.*, if the only individual named insured were deemed to be Innovative Packaging Corp., then no claim of the full

extent of the personal injury benefit provided by the policy's UM/UIM provisions would ever be possible, because an entity cannot suffer the predicate personal injury. That construction would render illusory the term of the policy establishing a $1,000,000 UM/UIM limit. *See Cook–Sauvageau v. The PMA Group*, 295 *N.J.Super.* 620, 627–28, 685 *A.*2d 978 (App.Div.1996), *certif. denied*, 150 *N.J.* 29, 695 *A.*2d 671 (1997).

There are other common sense reasons to consider plaintiff to be covered as a named insured. Plaintiff was not merely a permissive, occasional, or errand-specific user of the insured vehicle as was the plaintiff in *Aubrey*, who claimed the UIM limit of garage policy after sustaining injuries as the driver of a loaned vehicle; or as was the plaintiff in *Rao* who was driving a car leased by her husband. Plaintiff was the designated primary user of the insured vehicle and must thusly be seen to be covered as a direct insured.

The various conditions of the Limit of Insurance provisions of the policy employ the conjunctive "and"; thus, if any of the three conditions is not satisfied the "step-down" cannot apply. It is, therefore, of no consequence whether plaintiff was or was not a covered "family member" under her estranged husband's personal automobile insurance policy.

Our experience suggests that it is not uncommon for businesses to include the personal vehicles of company principals and their families within the coverage of business auto insurance policies. Thus, it is fair to consider the carrier to be on sufficient notice to be required to express any limitations in coverage with greater precision than was employed here, especially where it is clear on the face of the policy that the vehicle at issue, here a Corvette, is a personal-use automobile and is garaged at a location other than the place where the other vehicles insured under the business auto insurance policy are kept. *Cf. Progressive Cas. Ins. Co. v. Hurley*, 166 *N.J.* 260, 278–79, 765 *A.*2d 195 (2001).

 Applying the well-established principle of construction that insurance policies are subject to liberal construal in favor of the insured's reasonable expectations of coverage, *see Araya v. Farm Family Cas. Ins. Co.*, 353 *N.J.Super.* 203, 206–07, 801 *A.*2d 1194 (2002); *see also Progressive, supra,* 166 *N.J.* at 272–75, 765 *A.*2d 195, we are constrained by the language before us to hold that plaintiff was an insured under the Innovative policy, driving a covered vehicle, and therefore entitled to the full extent of that policy's UM/UIM coverage undiminished by the unmet conditions of the policy's "step-down" provisions. In reaching this conclusion, we reiterate the rationale we employed in *Araya*:

[W]hen a business auto policy fails to designate the insured business entity's human agent or agents entitled to receive UIM benefits, we will look to the declarations page as the best indicator of the insured's reasonable expectations of coverage. Any ambiguity created by boilerplate provisions found elsewhere in the policy will be resolved against the drafters of the policy and in favor of coverage. [*Araya, supra,* 353 *N.J.Super.* at 211, 801 *A.*2d 1194.]

Affirmed in part, as to coverage; reversed in part, as to the applicability of the policy's step-down provision.